**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE NATIONAL ASSOCIATION FOR THE EMPLOYMENT OF PEOPLE WHO ARE BLIND**, 3000 Potomac Ave., Alexandria, VA 22305;<br><br>**WEST TEXAS LIGHTHOUSE FOR THE BLIND**, 555 E 6th St., San Angelo, TX 76903;<br><br>**GOODWILL VISION ENTERPRISES**, 422 South Clinton Avenue, Rochester, NY 14620;<br><br>**LIGHTHOUSE LOUISIANA**, 123 State Street, New Orleans, LA 70118,<br><br>*Plaintiffs*,<br><br>v.<br><br>**UNITED STATES GENERAL SERVICES ADMINISTRATION**, 1800 F St. NW, Washington, DC 20405;<br><br>**EDWARD C. FORST, in his official capacity as Administrator of the General Services Administration**, 1800 F St. NW, Washington, DC 20405;<br><br>**JEFFREY KOSES, in his official capacity as Senior Procurement Executive of the General Services Administration**, 1800 F St. NW, Washington, DC 20405,<br><br>*Defendants*. | Civil Action No. 26-4059 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the National Association for the Employment of People Who Are Blind ("NAEPB"), West Texas Lighthouse for the Blind ("West Texas Lighthouse"), Goodwill Vision Enterprises ("GVE"), and Lighthouse Louisiana (West Texas Lighthouse, GVE, and Lighthouse Louisiana together, the "NPA Plaintiffs," and collectively with NAEPB, "Plaintiffs"), by and

through undersigned counsel, file this Complaint pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and allege as follows:

## NATURE OF THE ACTION

1. This lawsuit concerns the unlawful final agency action of the United States General Services Administration ("GSA") that, among other things, upends an over 40-year-old settled exception of the AbilityOne Program from the Trade Agreements Act ("TAA"). This exception allowed the NPA Plaintiffs and NAEPB's member agencies—AbilityOne qualified nonprofit agencies ("NPAs") tasked with employing and promoting individuals who are blind or have other severe disabilities ("NPAs")—to sell goods to the federal government without regard to the TAA's requirement that goods sold be wholly manufactured or substantially transformed in certain designated countries.

2. For nearly 100 years, Congress has used its power of the purse to encourage employment of individuals who are blind, a group that has a significantly higher unemployment rate than those without vision difficulty, by requiring federal agencies to purchase goods from the NPAs that employ them pursuant to the Wagner-O'Day Act, which was enacted into law in 1938. This mandate was expanded in 1971 to include NPAs that serve people with other severe disabilities through the passage of the Javits-Wagner-O'Day Act ("JWOD Act"). The JWOD Act established what is now known as the AbilityOne Program (administered by the U.S. AbilityOne Commission or the "Commission") to provide employment opportunities for the blind and severely disabled by requiring the government to purchase designated products from the NPAs. *See* 41 U.S.C. §§ 8501-8506. To ensure the success of these NPAs and their ability to employ blind and disabled persons, the JWOD Act contains a mandatory source framework, requiring federal

government agencies to purchase products and services from NPAs dedicated to training and employing individuals who are blind and severely disabled. 41 U.S.C. § 8504(a). The mandatory source nature of this statutory program is carried forward in the implementing regulations set forth at Federal Acquisition Regulation ("FAR") Part 8.

3. Congress reaffirmed this policy over the last half-century by excepting acquisitions under the AbilityOne Program from many standard federal acquisition requirements, such as full and open competition under the Competition in Contracting Act ("CICA"), FAR compliance and pricing requirements, and the sourcing requirements set forth in the TAA, in order to make it easier for NPAs to provide goods to the federal government and thereby create additional employment opportunities for people who are blind or severely disabled.

4. Without any Congressional action and without providing any notice or comment period, the GSA upended this priority on August 14, 2026, by issuing Class Deviation CD-2026-03 (the "Class Deviation"),[1] which strikes from Federal Acquisition Regulation ("FAR") 25.401(a)(4), a provision that excepted acquisitions under the AbilityOne Program (FAR Subpart 8.7) from the TAA since 1983. The supposed justification for the Class Deviation was an August 14, 2026 letter from the GSA Administrator, Defendant Edward C. Forst, who offered a number of false and misleading claims to support the alleged need for this action.

5. The Class Deviation, signed by Defendant Jeffrey Koses, the Senior Procurement Executive of GSA, removes the exception to the TAA upon which the NPA Plaintiffs and other NPAs relied to be able to sell goods to the federal government at prices and margins (established by the government) and, thus, to create job opportunities for people who are blind and severely

[1] A link to the Class Deviation can be found here: https://www.gsa.gov/policy-regulations/policy/acquisition-policy/acquisition-policy-library-and-resources/cd202603.

disabled. By eliminating the TAA exception for all GSA acquisitions, GSA's Class Deviation subjects Plaintiffs and all other NPAs to TAA sourcing restrictions that are fundamentally incompatible with the JWOD Act's mission and framework and that will have a significant and immediate impact on the availability of employment opportunities for people who are blind.

6. But under the JWOD Act's statutory framework and implementing regulations, described below, the GSA is precluded from issuing the Class Deviation.

7. After GSA issued the Class Deviation, the Commission issued Directive 27-01 on October 8, 2026 (the "Directive"). The Directive expands the scope of the Class Deviation to include the entirety of the Executive Branch and explicitly directs all NPAs that manufacture or provide products for sale through the AbilityOne Program to comply with the TAA.

8. Plaintiffs accordingly seek vacatur of the Class Deviation, as well as declaratory and injunctive relief.

## PARTIES

### The Named Plaintiffs

9. Plaintiff NAEPB is a 501(c)(6) non-profit organization incorporated in the Commonwealth of Pennsylvania. Founded in 2001, it is a membership association of AbilityOne qualified NPAs from across the United States that share the common goal of providing employment for people who are blind. NAEPB's mission is to represent and protect the collective interest of its member organizations to enable them to strengthen and maximize opportunities for people who are blind.

10. Members of NAEPB include qualified nonprofit agencies under the JWOD Act, including the other Plaintiffs in this action. Many of NAEPB's members sell Procurement List

products through GSA contracting vehicles and face the same harms as West Texas Lighthouse, Goodwill Vision Enterprises, and Lighthouse Louisiana, as detailed further below.

11. NAEPB is a fully representational membership organization. The Board of Directors conducts the business of NAEPB, and Directors are elected from and by the membership.

12. Members of NAEPB pay annual dues in an amount based on their AbilityOne revenue reported by request from National Industries for the Blind ("NIB"). NAEPB's membership includes nonprofit organizations and state agencies whose primary focus is employing persons who are blind, and is also open to consumer groups and business partners who actively support NAEPB's mission.

13. Among other things, NAEPB offers its members programming, technical assistance, advice on operations, and other valuable services.

14. West Texas Lighthouse is a 501(c)(3) non-profit organization and a qualified nonprofit agency for the blind[2] organized under the laws of Texas, with its principal place of business in San Angelo, Texas, and two other manufacturing operations in Abilene and Midland, Texas. West Texas Lighthouse's mission is to empower West Texans who are blind or visually impaired through meaningful employment. West Texas Lighthouse employs 78 people and has an annual overall sales revenue of $10.5 million. By using adaptive technologies, West Texas Lighthouse has legally blind employees in nearly every department, including manufacturing, logistics, eCommerce, human resources, customer service, and marketing. Over 90% of its direct employees—i.e., those employees whose work is required for the preparation, processing, and packaging of a product, or work directly related to the performance of a service—and over 70% of all its employees are legally blind.

[2] Qualified nonprofit agencies are defined within the JWOD Act and described further below.

15. West Texas Lighthouse sells a large range of products, including lanyards, badge holders, safety gloves and glasses, writing instruments, and other office products. Many of these products contain components from a variety of different countries and are brought to West Texas Lighthouse's facilities for assembly by employees who are blind and visually impaired.

16. Founded in 1963, West Texas Lighthouse has sold its products to the federal government through the AbilityOne Program for decades. West Texas Lighthouse currently has 107 different products on the Procurement List (defined and discussed below), which it sells through a network of distributors and wholesalers.

17. West Texas Lighthouse's sales to the federal government comprise approximately 21.6 percent of West Texas Lighthouse's sales revenue. In 2025, West Texas Lighthouse's total revenue from its federal sales totaled $2,270,848. West Texas Lighthouse's federal sales support the employment of approximately 50 individuals who are blind or visually impaired.

18. Goodwill Vision Enterprises ("GVE") is a 501(c)(3) non-profit organization and a qualified NPA organized under the laws of New York, with its principal place of business in Rochester, New York. Together with its sister agency, Goodwill of the Finger Lakes ("GFL"), GVE operates programs spanning more than 20 counties across New York State.

19. GVE's mission is to empower children and adults who are blind or visually impaired, including through vision rehabilitation therapy and orientation and mobility services that help individuals live and travel independently in their homes and communities. GVE and GFL together have an annual budget exceeding $75 million and a team of more than 900 employees, and in 2025 their mission programs impacted more than 171,000 people throughout New York State.

20. GVE kits, packages, and distributes more than 90 different products from its Rochester facility, including self-stick notes, flags, and easel pads; cleaning products; safety products; and technology products such as label makers and printers, scales, and portable computer monitors. Many of these products contain components from a variety of different countries and are brought to GVE's Rochester facility for assembly, kitting, and packaging by employees who are blind or visually impaired. GVE employs approximately 18 to 25 individuals who are blind or visually impaired to work on these product lines.

21. GVE has sold its products to the federal government through the AbilityOne Program since 1990 and currently has approximately 150 individual National Stock Numbers ("NSNs") on the Procurement List, 69 of which are sponsored by GSA and listed on the GSA Schedule. GVE sells these products through two wholesalers, approximately 15 to 20 distributors, and other AbilityOne NPAs that operate Base Supply Centers, and the majority of the products GVE sells to wholesalers and distributors are ultimately delivered to the federal government.

22. Lighthouse Louisiana is a 501(c)(3) non-profit organization and a qualified NPA organized under the laws of Louisiana, located in New Orleans and Baton Rouge, Louisiana. Lighthouse Louisiana's mission is to empower people with disabilities through services, employment, and advocacy.

23. Lighthouse Louisiana sells approximately 43 products through the AbilityOne Program, including janitorial and sanitation, niche, and military resale products. Lighthouse Louisiana sells these products through National Industries for the Blind and the AbilityOne Program, both directly to the Defense Logistics Agency at pricing approved by GSA and to distributors who in turn sell directly to GSA.

24. Approximately 50 individuals who are blind work on the products that Lighthouse Louisiana sells to the federal government.

25. In fiscal year 2025, Lighthouse Louisiana's sales revenue from its products to the federal government totaled $17,041,802. Approximately 87 percent of Lighthouse Louisiana's overall sales revenue comes from its sales to the federal government, and its production revenue supports all of Lighthouse Louisiana's community service programs, including programs that are vital to the successful employment of people who are blind or have other significant disabilities.

**Defendants**

26. Defendant GSA is an independent agency of the Federal Government responsible for, among other things, managing government procurement through the Federal Supply Schedule and Multiple Award Schedule programs, from which government agencies may purchase products. GSA's principal offices are located at 1800 F Street, NW, Washington, D.C. 20405.

27. Defendant Edward C. Forst is the Administrator of GSA and is sued in his official capacity. Mr. Forst signed the letter from GSA dated August 14, 2026, which directed the GSA Senior Procurement Executive to "eliminate" the TAA exception.

28. Defendant Jeffrey Koses is the Senior Procurement Executive of GSA and is sued in his official capacity. Mr. Koses signed the Class Deviation CD-2026-03 issued on August 14, 2026.

## JURISDICTION

29. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This action arises under the APA, 5 U.S.C. §§ 702, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

30. The Class Deviation constitutes final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

## VENUE

31. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States and officers thereof acting in their official capacities, and Defendant GSA maintains its principal office in this District.

## STATUTORY AND REGULATORY BACKGROUND

### A. The JWOD Act's Mandatory Source Requirement and the AbilityOne Program

32. The Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501–8506, establishes the AbilityOne Program, a comprehensive program to increase employment and training opportunities for individuals who are blind or have other severe disabilities. The statutory requirements of the JWOD Act are implemented through the federal government's procurement system.

33. The JWOD Act's centerpiece is its mandatory-source requirement, which provides: "An entity of the Federal Government intending to procure a product or service on the procurement list . . . shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled." 41 U.S.C. § 8504(a).

34. Qualified NPAs for the blind and qualified NPAs for the severely disabled are defined in the JWOD Act.[3] *See* 41 U.S.C. § 8501(6). In order to qualify as an NPA under the JWOD Act, a nonprofit agency must employ blind or severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or the provision of goods and

[3] The JWOD Act's implementing regulations specify that "Severely disabled individual," "Severe disability," "Significantly disabled individual," and "Significant disability" are "interchangeable or synonymous terms used within the AbilityOne Program to describe persons with severe disabilities who qualify to participate in the AbilityOne Program." *See* 41 C.F.R. § 51-1.3.

services offered by the NPA. 41 U.S.C. §§ 8501(6)-(7). The NPA Plaintiffs, and the NAEPB member agencies on whose behalf NAEPB sues, are qualified NPAs for the blind and/or the severely disabled.

35. The JWOD Act's mandatory-source requirement is not discretionary. It is a statutory command that federal agencies "shall" purchase products and services on the Procurement List from AbilityOne NPAs, and it reflects Congress's determination that providing employment to individuals who are blind or severely disabled is a paramount federal procurement priority. *See* 41 C.F.R. § 51-1.1 (declaring it "the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities"). Thus, once a product is added to the Procurement List, federal agencies must purchase the product from the designated NPA. The Commission has the sole authority to add items to and to delete items from the Procurement List according to statutorily mandated criteria.

36. The JWOD Act directs the Commission to designate central nonprofit agencies ("CNAs") to facilitate the distribution of government orders for products and services on the Procurement List among qualified NPAs. 41 U.S.C. § 8503(c). The Commission has designated two CNAs to represent NPAs for the blind and NPAs employing persons with other severe disabilities, respectively: National Industries for the Blind ("NIB") and SourceAmerica. *See* 41 C.F.R. § 51-3.1.[4]

---

[4] Although the JWOD Act's implementing regulations designate the National Industries for the Severely Handicapped or "NISH" as the designated central nonprofit agency to represent nonprofit agencies employing persons with other severe disabilities, 41 C.F.R. § 51-3.1(b), NISH rebranded itself as "SourceAmerica" in 2013. *See* U.S. AbilityOne Comm'n, *History*, AbilityOne.gov, https://www.abilityone.gov/abilityone_program/history.html (last visited Nov. 17, 2026) ("2013 - NISH begins operating as SourceAmerica® to better represent the exceptional workforce that inspires its vision: employment for every person with a significant disability.").

**B. Regulatory Implementation of the JWOD Act's Mandatory-Source Framework**

37. Part 8 of the Federal Acquisition Regulation (the "FAR"), codified at Title 48 of the Code of Federal Regulations, addresses the Government's priority of sources for procurement of goods and services, which must be followed prior to a government agency engaging in a competitive procurement action. 48 C.F.R. § 8.000.

38. Specifically, FAR 8.002, the priority of sources provision, provides that agencies "shall satisfy requirements for supplies and services" through mandatory sources of supply in a prescribed priority order, with supplies and services on the Commissions' Procurement List listed as a priority source. 48 C.F.R. § 8.002.

39. FAR Subpart 8.7, titled "Acquisition from Nonprofit Agencies Employing People Who Are Blind or Severely Disabled," prescribes policies and procedures for implementing the JWOD Act.

40. FAR 8.704(a) states that the JWOD Act "requires the Government to purchase supplies or services on the Procurement List, at prices established by [the Commission], from AbilityOne participating nonprofit agencies if they are available within the period required." 48 C.F.R. § 8.704(a). To the extent an item is on the Procurement List, it must be purchased from the designated NPA, and the Government is precluded from engaging in competitive procurement action.

41. FAR 8.704(b) also unambiguously provides that "[n]o other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List."

42. The JWOD Act's implementing regulations further state that, for commodities on the Procurement List, "the mandatory source requirement covers the [NSN] or item designation listed and commodities that are essentially the same as the listed item." *See* 41 C.F.R. § 51-5.13(a)

(emphasis added). Contracting activities "are not permitted to purchase commercial items that are essentially the same as commodities on the Procurement List." *See id.* § 51-6.13(c). In other words, the Procurement List and JWOD's mandatory-source requirements cannot be circumvented by offering essentially the same products. This is further evidence of the priority afforded to procurement from NPAs, regardless of country of origin.

**C. The AbilityOne Commission and the Procurement List**

43. The JWOD Act establishes the Commission, an independent federal agency that is directed under the JWOD Act to administer the AbilityOne Program. 41 U.S.C. §§ 8502-8503; 41 C.F.R. §51-1.1(a); 48 C.F.R. § 8.702.

44. The Commission maintains the "Procurement List"—a list of products and services that federal agencies are required to purchase from AbilityOne NPAs if the commodity or service is on the list and is available in the time frame required by the government entity. 41 U.S.C. § 8503(a); *see also* 48 C.F.R. §§ 8.701, 8.703; 41 C.F.R. § 51-1.2(a).

45. The regulations make clear that, except with regard to commodities provided by Federal Prison Industries, Inc., the AbilityOne NPAs have "priority . . . over any other supplier of the Government's requirements for commodities and services on the Committee's Procurement List." 41 C.F.R. § 51-1.2(b).

46. Before adding or deleting any item from the Procurement List, the Commission must make a "Determination of Suitability" based on certain criteria. *See* 41 C.F.R. § 51-2.4(a). Those criteria include employment potential of the blind and severely disabled, a determination that the NPA is a qualified NPA, the NPA's capability to supply the product, and the level of impact on the current contractor for the commodity or service. *Id.* The Commission also "considers other information it deems pertinent" in making a suitability determination, such as comments on

a proposal published in the Federal Register and information submitted by Government personnel and interested persons. 41 C.F.R. § 51-2.4(b).

47. A commodity's place of manufacture is not one of the criteria that the Commission must consider. *See* 41 C.F.R. Part 51.2.

48. The Commission may only add or remove services and products from the Procurement List through formal notice-and-comment rulemaking in accordance with the APA. 41 U.S.C. § 8503(a)(2); *see also* 5 U.S.C. § 553(b)–(e); 41 C.F.R. § 51-2.3.

49. The Commission is allowed to prescribe regulations "as necessary to carry out" the JWOD Act. 41 U.S.C. § 8503(d); *see also* 48 C.F.R. § 8.702(c) (stating the Commission "is responsible for . . . [e]stablishing rules and regulations to implement" the JWOD Act).

50. The Commission's regulatory power under the JWOD Act is thus limited to carrying out the JWOD Act's purposes — it does not empower the Commission (much less a procuring agency like GSA) to override the statute's mandatory-source requirement.

**D. The Trade Agreements Act and the FAR 25.401(a)(4) Exception**

51. The Trade Agreements Act of 1979, 19 U.S.C. §§ 2501 *et seq.*, restricts certain government purchases to products made or substantially transformed in the United States or a designated trade partner country.

52. The TAA does not apply to every government acquisition. Under FAR 25.402, the TAA applies only to acquisitions valued at or above specified dollar thresholds, which vary by trade agreement; acquisitions below those thresholds remain subject to the more restrictive Buy American Act, *see* 41 U.S.C. Chapter 83; *see also* FAR Subparts 25.1-25.2, rather than the TAA. *See* FAR 25.402(b).

53. The TAA is generally applicable to GSA Schedule contracts and other GSA contracting vehicles. However, the regulations implementing the TAA explicitly exempt certain types of acquisitions from application of the TAA. *See* FAR 25.401. Exempted acquisitions include those: (1) set aside for small businesses; (2) of arms, ammunition, or war materials, or purchases indispensable for national security or for other national defense purposes; (3) end products for resale; (4) from Federal Prison Industries, Inc. and from Nonprofit Agencies Employing People who are Blind or Severely Disabled; and (5) not using full and open competition, if authorized by regulations.[5]

54. Thus, as per the TAA's own implementing regulations, acquisitions of goods from the Procurement List provided by qualified NPAs, like the NPA Plaintiffs, do not need to meet the TAA's sourcing requirements.

55. Indeed, the TAA's own legislative history makes clear that it was Congress' intent to exempt goods sold by qualified NPAs from the TAA's requirements. *See* 1979 Committee Report on TAA, S. Rep. No. 96-249, at 130 ("U.S. coverage under the agreement will not affect our set-aside programs for small and minority businesses, or contracts for goods made in prisons, by the blind, or by the severely handicappsd [sic]."); *see also* S. Rep. No. 96-249, at 132 (noting "Prison- and Blind-Made Goods . . . are an exception to" TAA "coverage").

56. The Commission—the sole agency statutorily tasked with implementing the JWOD Act—has likewise explained that the AbilityOne Program is "exempt from" the TAA in order "to protect" the program. *See* 70 Fed. Reg. 32,567 (June 3, 2005) ("the Committee's [JWOD] program is exempt from the Trade Agreements Act, *see* 48 C.F.R. 25.401(a)(4), and the rationale for that

[5] Separately, as a result of the enactment of the Federal Acquisition Streamlining Act ("FASA"), GSA excepts from domestic sourcing requirements, including the TAA, acquisitions below certain amounts and/or made using government purchase cards. Thus, GSA has long been acquiring products from a variety of sources without regard to their TAA compliance.

exemption—to protect socioeconomic programs such as the Committee's program—is such that the Committee believes its program is exempt from related [domestic sourcing] statutes such as the Buy American Act.").

57. Since at least 1983 and until GSA's August 14, 2026 Class Deviation, the FAR (and the recently issued corresponding RFO provisions) has expressly stated that the TAA does not apply to **acquisitions under FAR Subpart 8.7—acquisitions from Nonprofit Agencies Employing People Who are Blind or Severely Disabled (*i.e.*, the AbilityOne Program).** *See* FAR 25.401(a)(4) (emphasis added); *see also* 48 Fed. Reg. 42,101 (Sept. 19, 1983).

58. The practical effect of the FAR 25.401(a)(4) exception is that commodities sold by AbilityOne NPAs through a GSA contracting vehicle are situated entirely outside the federal government's domestic sourcing framework, which protects the AbilityOne Program and increases jobs for the blind and severely disabled who otherwise would have no opportunity for meaningful employment, thereby furthering the purpose of the JWOD Act. This arrangement has been in place for over four decades and, as such, has resulted in the creation of jobs for thousands of individuals who are blind. GSA has failed to proffer any meaningful justification for revocation of this statutorily supported, decades old exception.

### E. 41 U.S.C. § 1707 Publication Requirements and Class Deviation Authority

59. The Office of Federal Procurement Policy (OFPP) Act, at 41 U.S.C. § 1707, contains notice and comment requirements that apply to "executive agenc[ies]," as defined under 41 U.S.C. § 133. GSA is an "executive agency" under the relevant definition and is therefore required to provide notice and comment period prior to issuing a procurement policy, regulation, procedure, or form that relates to the expenditure of appropriated funds and has a significant effect beyond the internal operating procedures of the agency or has a significant cost or administrative impact on contractors or offerors. *See* 41 U.S.C. §§ 1707(a)(1), (b).

60. Specifically, 41 U.S.C. § 133(3) provides that an executive agency includes an "independent establishment as defined" under 5 U.S.C. § 104(1). 5 U.S.C. § 104(1) provides that an "independent establishment" means "an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment."

61. GSA is "an establishment in the executive branch" that is not the United States Postal Service or the Postal Regulatory Commission. It was established under 40 U.S.C. § 301 et seq. ("The General Services Administration is an agency in the executive branch of the Federal Government."), and is headed by the Administrator of General Services, appointed by the President with the advice and consent of the senate.

62. GSA is thus an "independent establishment" and therefore an executive agency under 41 U.S.C. § 133 and is subject to the notice and comment requirements set forth at 41 U.S.C. § 1707.

63. 41 U.S.C. § 1707 provides that a "procurement policy, regulation, procedure, or form (including an amendment or modification thereto)" may not take effect until 60 days after the head of the agency publishes it for public comment in the Federal Register if the policy, regulation, procedure, or form (A) "relates to the expenditure of appropriated funds" and (B) has a "significant effect beyond the internal operating procedures" of the issuing agency or has a "significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)(1)(A)-(B)(i)-(ii).

64. Changes to the FAR are managed, coordinated, controlled, and monitored by the Federal Acquisition Regulatory Council ("FAR Council"), composed of the Administrator of General Services, the Secretary of Defense, and the NASA Administrator. 41 U.S.C. § 1303(d).

65. Individual agencies may make exceptions to the FAR, known as "deviations," that affect only one contract action (an "individual deviation") or multiple contract actions (a "class deviation"), "unless precluded by law." FAR 1.401(a);[6] FAR 1.403, 1.404; *see also* RFO 1.303, 1.304(a); FAR 1.402; *see also* RFO 1.302(a).

66. FAR 1.404 further provides, however, that when an agency knows it will require a permanent class deviation, it "should propose a FAR revision, if appropriate."[7]

67. Significant revisions to the FAR (*i.e.*, those altering the substantive meaning of any coverage in the FAR and having a significant cost or administrative impact on contractors or offerors) must be published for comment in the Federal Register. *See* FAR 1.501-1, FAR 1.501-2.

68. Although § 1707 does not specifically address class deviations, courts have found that a class deviation may fall within any of the various categories of procurement changes identified in the OFPP Act that require publication in the Federal Register. *See Navajo Refining Co., L.P. v. U.S.*, 58 Fed. Cl. 200, 209 (2003); *see also La Gloria Oil and Gas Co. v. U.S.*, 56 Fed. Cl. 211, 221-22 (2003), *abrogated on other grounds by Tesoro Hawaii Corp. v. U.S.*, 405 F.3d 1339 (Fed. Cir. 2005) ("Because defendant obtained the class deviation in contravention of the

---

[6] RFO Subpart 1.3 similarly addresses deviations from the FAR and uses substantially the same language to define deviations. *See* RFO 1.301(a) (defining deviation as "[i]ssuing or using a policy, procedure, . . . method, or practice of conducting acquisition actions of any kind at any stage of the acquisition process that is inconsistent with the FAR").

[7] RFO 1.304(a) similarly states that, when "an agency knows that it will require a class deviation on a permanent basis, it may develop and propose a FAR revision." Under the RFO, agency-specific class deviations "must be approved by the FAR Council, except where required to implement agency-specific executive or statutory direction." RFO 1.304(b). The differences in the steps between the FAR and the RFO for issuing proposed class deviations do not substantively affect Plaintiffs' claims here.

publication requirements established by . . . the OFPP Act, the class deviation was not authorized and is not valid[.]”).

69. The length of the public comment period “may not be less than 30 days.” 41 U.S.C. § 1707(b).

70. Where there are “compelling circumstances” a policy, regulation, procedure, or form may take effect earlier than 60 days after public notice and comment, but “the effective date may not be less than 30 days after the publication date.” 41 U.S.C. § 1707(a)(2).

71. While the public notice and comment requirements described in 41 U.S.C. §§ 1707(a) and (b) “may be waived by the officer authorized to issue a procurement policy, regulation, procedure, or form,” that is only true “if urgent and compelling circumstances make compliance with the requirements impracticable.” 41 U.S.C. § 1707(d). Even so, the waived policy is effective temporarily only if published with a statement that it is temporary and accompanied by a 30-day comment period. 41 U.S.C. § 1707(e)(1). After considering the comments received concerning the waived policy, “the head of the agency waiving the requirements” of Section 1707(a) and (b) “may issue the final procurement policy, regulation, procedure, or form.” 41 U.S.C. § 1707(e)(2).

72. Here, the GSA did not provide a notice and comment period prior to issuing the Class Deviation, nor can GSA demonstrate any “urgent and compelling circumstances” that would justify waiving this requirement.

**G. The Administrative Procedure Act**

73. The APA “confers a general cause of action upon persons ‘adversely affected or aggrieved by’” unlawful final agency action. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). *See also* 5 U.S.C. § 704.

74. The GSA is an "agency" within the meaning of the APA. 5 U.S.C. §§ 551(1); 701(b)(1).

75. The APA waives the government's sovereign immunity and confers jurisdiction on district courts where the claimant seeks relief "other than money damages," 5 U.S.C. § 702, "there is no other adequate remedy in a court," *id.* § 704, and no other immunity-waiving statute "expressly or impliedly forbids" the particular relief being sought under the APA, *id.* § 702.

76. The APA's jurisdictional waiver described in Paragraph 75 applies in this case.

77. Plaintiffs here seek relief "other than money damages"—indeed, they seek no money damages whatsoever. *See* 5 U.S.C. § 702.

78. There is no other adequate remedy in a court, including because no "previously established special statutory procedures" exist that can provide Plaintiffs the equitable relief they seek concerning the Class Deviation. *Bowen v. Massachusetts*, 487 U.S. 879, 903-904 (1988).

79. No other immunity-waiving statute "expressly or impliedly forbids" the relief Plaintiffs seek under the APA—namely, that the GSA's final agency action, the Class Deviation, be set aside for violating the APA. 5 U.S.C. § 702.

80. Agency conduct is "agency action" under the APA if it is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

81. Agency action is "final" if it (1) "mark[s] the consummation of the agency's decision-making process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

82. The Class Deviation, which strikes from the FAR Section 25.401(a)(4) for all GSA acquisitions, is "agency action" as defined under the APA. *See* 5 U.S.C. § 551(13).

83. The Class Deviation is final agency action as defined under the APA.

84. The Class Deviation is the consummation of the agency's decision-making process—among other things, it is a clear exercise of GSA's power, claimed to be effective "immediately," and expressly stated that the "GSA acquisition workforce ***must follow***" the Class Deviation. (emphasis added).

85. The Class Deviation is also "one by which rights or obligations have been determined, or from which legal consequences will flow." Among other things, the Class Deviation "is applicable to all GSA acquisitions" and subjects the NPA Plaintiffs and other NPAs to TAA restrictions that are fundamentally incompatible with the JWOD Act's mandatory-source framework.

## FACTUAL ALLEGATIONS

### A. Preface to the Improper Class Deviation

86. On January 20, 2025, President Trump issued a Memorandum for the Secretary of State, Secretary of the Treasury, Secretary of Defense, Secretary of Commerce, Secretary of Homeland Security, the Director of Office of Management and Budget, the Assistant to the President for Economic Policy, and the Senior Counselor for Trade and Manufacturing titled the "America First Trade Policy" (the "January Memo").

87. Among other things, the January Memo instructed various of those officials to "identify any unfair trade practices by other countries and recommend appropriate actions to remedy such practices under applicable authorities," including "trade agreement implementing acts."

88. It further instructed the United States Trade Representative, in consultation with the Senior Counselor for Trade and Manufacturing, to "review the impact of all trade agreements

. . . on the volume of Federal procurement covered by Executive Order 13788" and "make recommendations to ensure that such agreements are being implemented in a manner that favors domestic workers and manufacturers, not foreign nations."[8]

89. The January Memo further directed that it "shall be implemented consistent with applicable law and subject to the availability of appropriations."

90. "Applicable law" exempted NPAs from the TAA's sourcing requirements.

91. The January Memo did not instruct GSA or the Commission to act.

92. On September 10, 2025, the Commission issued Directive 25-01, noting its "commitment to supporting" the January Memo and offering "guidance" to achieve the President's objectives while expressly acknowledging the existing legal framework applicable to AbilityOne NPAs, which includes the FAR 25.401(a)(4) TAA exception.

93. Specifically, Directive 25-01 stated that "[w]hile the TAA excepts AbilityOne contracts, the Commission's position is that NPAs should nonetheless make a good faith effort to comply with the TAA" and other domestic sourcing laws "to the maximum extent practicable." The Directive made no mention of adjustments to Fair Market Price, the sale price of Procurement List items determined by the Commission resulting from higher production costs associated with TAA compliance.

94. In other words, as of September 2025, the Commission itself recognized that the language set forth in FAR 25.401(a)(4), which clearly exempts purchases from AbilityOne NPAs from the requirements of the TAA, was operative and legally binding, but encouraged voluntary good-faith compliance with TAA in light of the January Memo.

---

[8] Executive Order 13788 ("Buy American and Hire American") stated that it was the "policy of the executive branch to maximize, consistent with law . . . the use of goods, products, and materials produced in the United States." The TAA does not mandate that goods and products be produced exclusively in the United States. Thus, requiring NPAs to comply with the TAA does not further the goals set forth in the Executive Orders referenced herein.

95. Many NPAs, including the NPA Plaintiffs, followed this guidance and strived to comply with the TAA's sourcing requirements where possible, but full compliance was not possible while maintaining the NPAs' mission of employing blind and severely disabled individuals.

96. On March 13, 2026, President Trump issued Executive Order 14392 ("Ensuring Truthful Advertising of Products Claiming to be Made in America").

97. Executive Order 14392 stated that "American citizens attempting to buy American products should have certainty as to what American-origin claims mean," and therefore, among other things, instructed agencies overseeing Government-wide acquisition contracts to "periodically review and verify any 'Buy American Act,' 'Country of Origin USA,' or similar American-origin claims for products acquired through these contracts."

98. Executive Order 14392 further stated that it "shall be implemented consistent with applicable law and subject to the availability of appropriations."

99. Once again, the current "applicable law" exempts NPAs from the TAA's sourcing requirements. In any event, the TAA does not require goods and products to be manufactured or substantially transformed exclusively in the United States. Thus, requiring NPAs to comply with the TAA does not further the executive orders referenced *supra*.

100. On March 16, 2026, the FAR Council issued its updated model deviation text for RFO Part 25. Under the model deviation text, RFO 25.401 maintained the existing language in FAR 25.401(a)(4) that exempts AbilityOne NPAs from complying with the TAA.

101. In other words, even after the January Memo and Executive Order 14392, the FAR Council reaffirmed the exception for NPAs from the TAA's requirements.

102. The Commission also continued to recognize the TAA exception as applicable to the NPAs. On May 1, 2026, the Commission issued a second Directive (26-02) implementing "guidance" further "build[ing] upon" Directive 25-01 and further encouraging compliance with domestic sourcing laws and suggesting phased implementation.

103. Directive 26-02 further provided that beginning July 1, 2026, before a new product would be added to the Procurement List or before a price change is approved, an NPA or CNA—as applicable—should certify that the product met applicable sourcing laws or that "*it meets an exception in accordance with the Federal Acquisition Regulation (FAR) or other applicable law*." (emphasis added).

**B. GSA Class Deviation CD-2026-03 (August 2026)**

104. A month later, however, at the direction of the GSA Administrator, GSA Senior Procurement Executive Jeffrey Koses issued Class Deviation CD-2026-03 for all GSA acquisitions on August 14, 2026, without providing any notice and without providing a comment period.

105. The Class Deviation strikes FAR 25.401(a)(4) and "[r]emoves the exception to Trade Agreements Act of 1979 (TAA) applicability for AbilityOne Participating Nonprofit Agencies (AbilityOne) and Federal Prison Industries, Inc. (FPI)."

106. The Class Deviation claims this change is necessary because "[u]nder this TAA exception, AbilityOne and FPI can offer products originating in the People's Republic of China on GSA contracts. This adds cost and complexity for GSA in awarding and administering these contracts as it imposes a different standard specific only to these mandatory sources." The Class Deviation claims that "[r]emoving this exception will (1) ensure removal of these items from GSA contracts and reduce the risk of Chinese-made products entering the Government's supply chain; and (2) ensure consistent application of the TAA on GSA acquisitions."

107. The Class Deviation's claims are inaccurate for several reasons. The Class Deviation leaves the FAR's TAA exception in place for other groups, such as small businesses, and thus it does not ensure removal of "these items" from GSA contracts. This also means that the Class Deviation does not reduce the risk of Chinese-made products entering the Government's supply chain; nor does it ensure consistent application of the TAA on GSA acquisitions. The Class Deviation also failed to identify how the AbilityOne TAA exception resulted in risk to the Government's supply chain.

108. The Class Deviation "instruct[ed]" that as a result of the Class Deviation, the "GSA acquisition workforce must follow the new deviated FAR text," that "offerings from these mandatory sources must comply with the TAA," and that the GSA acquisition workforce must "[f]ollow the same process for offerings from these mandatory sources as you would for other contractors."

109. The Class Deviation further instructed that for new solicitations and resulting contracts, one must "use the deviation text and review items offered by these mandatory sources for compliance with the TAA," and for open solicitations and awarded contracts, "contracting officers have discretion in managing items on their particular acquisitions, and can amend open solicitations or modify existing contracts as appropriate." As such, the Class Deviation would allow GSA to circumvent the mandatory source nature of the JWOD Act and the AbilityOne Program because it would no longer be required to purchase Procurement List items that are not TAA compliant.

110. The Class Deviation was made effective immediately and "remains in effect until rescinded or if it is incorporated into the FAR."

111. GSA did not publish the Class Deviation in the Federal Register.

112. GSA did not invite or accept public comment on the Class Deviation.

113. GSA did not invoke the urgent-and-compelling waiver provision of 41 U.S.C. § 1707(d).

114. GSA did not designate the Class Deviation as temporary.

115. GSA issued the Class Deviation unilaterally without direction from any statute or executive order specifically mandating this action, and without consultation with or authorization from the Commission.

### C. GSA's Contemporaneous Explanations for the Class Deviation Confirm That It Lacked Reasoned Decision-Making.

116. On August 14, 2026—the same day GSA issued the Class Deviation—GSA Administrator Edward C. Forst sent a letter to Christina Brandt, the AbilityOne Commission Chairperson, informing her that GSA was acting to "eliminate the exception that permits the Commission to offer items originating in China and other non-allied nations."

117. Invoking Executive Order 14392, "Ensuring Truthful Advertising of Products Claiming to be Made In America," the letter stated that GSA sought to "verify the accuracy of all products represented as 'Made in America' across all GSA-managed buying platforms."

118. Based on those assertions, the August 14 letter directed the Commission to "promptly conduct a full audit of all items offered for sale through GSA and related procurement data to verify COO representations, pricing, sourcing, and compliance with applicable law and policy," and set a November 12, 2026 deadline for initial compliance.

119. The letter cited no statutory or regulatory authority for eliminating the exception, nor did it address the reliance interests of AbilityOne NPAs or the effect the Class Deviation would have on the blind and severely disabled individuals they employ.

120. In fact, the rationale offered in support of the Class Deviation—reducing reliance on products "originating from China"—is not even aligned with removing the TAA exception, as the TAA requires the purchase of either U.S.-made or designated country end products or products that have been "substantially transformed" in those countries. In other words, end products that have component parts "originating from China" could still be TAA-compliant if they are substantially transformed in a designated country. Thus, the Class Deviation does not even accomplish its stated goal. Moreover, by treating COO documentation as a proxy for TAA compliance, the Class Deviation imposes on NPAs an additional burden that the TAA does not require, and it threatens the removal of products from GSA contracts that may in fact be TAA-compliant.

121. Moreover, GSA provided no explanation as to why it was removing the TAA exception for AbilityOne NPAs while leaving exceptions in place for other groups, such as small businesses. The August 14, 2026 letter also failed to recognize that federal agencies do, in fact, regularly purchase products from countries such as China, because agencies are permitted to buy products on the commercial market – including from Amazon – using a government credit card as long as the purchase is under the micro-purchase threshold (currently $15,000, per FAR 2.101). In this respect, federal agencies can simply bypass domestic sourcing requirements altogether by making multiple purchases as long as each individual purchase falls under the regulatory limit. The realities of government acquisition, especially of commercial and commodity products, undermine GSA's convenient invocation of national security and claims of supply chain risk.

122. GSA's August 14, 2026 letter also contained a number of inaccurate or misleading statements. For example, GSA claimed that "products sold to the Government by AbilityOne-affiliated nonprofits carry markups of up to 55 percent" due to inflated executive compensation,

which is not only inaccurate but also demonstrates a complete lack of understanding regarding the manner in which the AbilityOne Commission sets Fair Market Price for commodities on the Procurement List.[9] Further, the letter also incorrectly stated that the AbilityOne Commission's application of the "Essentially the Same" (ETS) policy has allowed AbilityOne to "replace American-made products from GSA's platforms with their own products that appear to be foreign-sourced from countries like China." Finally, the letter repeated inaccurate and unfounded claims that certain AbilityOne products were sourced overseas when a simple investigation would have uncovered the fact that such products were actually manufactured in the United States.

123. On September 4, 2026, the Commission responded to GSA's letter, noting that many of the letter's factual premises were inaccurate or misleading. The Commission reported in its response that its "review of the examples cited by GSA found no evidence of systemic foreign sourcing," and that technical evaluations "conducted jointly with GSA engineers" confirmed that the AbilityOne products designated as ETS "are domestically sourced and meet the same or higher U.S. content . . . standards as the compared commercial items." The Commission also explained that the 55 percent figure was "misleading" because that ceiling "applies only to commercial distributors who resell AbilityOne products, not to the nonprofit agencies that manufacture or assemble Procurement List items."

124. On August 21, 2026, GSA held a virtual meeting with Defendant Jeffrey Koses of GSA and the Executive Director of the AbilityOne Commission to discuss the Class Deviation. Several NPAs and CNA representatives also were in attendance. During the meeting, the NPAs and CNA representatives called out the numerous errors in the GSA August 14, 2026 letter. For example, Lighthouse Louisiana's President and CEO explained that the two Lighthouse Louisiana

[9] Notably, the Commission considers prices of products from other countries, such as China, in determining Fair Market Price for commodities on the Procurement List.

products featured in the August 14, 2026 letter's appendices had been reshored and are domestically sourced, and Lighthouse Louisiana had not sourced the challenged product from the supplier the letter identified since 2021. Another NPA explained that GSA had long known of, and approved, the domestic assembly process for products the letter portrayed as mislabeled.

125. Some of the discussion at the August 21 meeting focused on the timing of the implementation of the Class Deviation. Participants and NPA representatives further noted that GSA contracting officers had begun to hold up pricing and acquisition actions because they did not know how to proceed, and asked whether GSA would issue uniform guidance on implementing the Class Deviation. GSA stated during the meeting that although the Class Deviation was currently in effect, its "implementation journey" has several steps, including updating GSA's federal supply schedule solicitations through a formal refresh process before current contracts are updated. Mr. Koses said in the August 21, 2026 virtual meeting that this process "will take some time" to occur.

126. Since issuing the Class Deviation, GSA has started issuing modifications to entities holding federal supply schedule contracts but has not provided any additional guidance on implementing the Class Deviation. These modifications have resulted in the elimination of products included on the GSA Schedule, meaning those products will no longer be purchased by GSA or any other governmental entity purchasing off the Multiple Award Schedule.

127. In the meantime, on October 8, 2026, the Commission issued Directive 27-01, titled "Transparency, Accuracy, and Accountability in Country-of-Origin Documentation" (the "Commission Directive"), effective immediately, in order to further effectuate the GSA Class Deviation. The Directive rescinds any prior Directive provisions that refer "to TAA compliance as discretionary" insofar as those provisions pertain to those GSA contracting vehicles. Pursuant to

the Directive, beginning November 12, 2026, products listed for sale on a GSA Schedule contract or Blanket Purchase Agreement (BPA) must be TAA-compliant regardless of dollar amount. Additionally, NPAs must certify that their products are TAA-compliant before being added to the Procurement List or before receiving an authorized price change for the product.

128. Despite GSA's assurances that implementation would not take effect immediately, GSA began unilaterally removing products from its federal supply schedule contracts on or about October 23, 2026. It did so without confirming TAA compliance of such products and without any input from the NPAs. In certain cases, GSA incorrectly removed products that actually are TAA-compliant. For example, on or about October 23, 2026, GSA removed 58 of West Texas Lighthouse's products from its GSA Advantage contract, purportedly because those products violated the TAA, even though at least two of the removed products are TAA-compliant. GSA did not provide West Texas Lighthouse any notice before taking this action. On or about the same date, two of GVE's Dymo label printer products from its GSA Schedule contract were also removed, without notice to GVE.

**E. Impact on Plaintiffs**

129. The unlawful Class Deviation catastrophically affects each of the NPA Plaintiffs and NAEPB's member agencies.

130. On October 2, 2026, GSA issued a mass modification to GSA's MAS Solicitation No. 47QSMD20R0001 (hereinafter the "Refresh 0033 Modification"). The Refresh 33 Modification requires all GSA MAS contract holders—including wholesalers, distributors, and other contract holders that sell AbilityOne products—to accept the modification within 90 days. The modification is not optional; if the contractor chooses not to accept the modification, its Contract will be terminated.

131. The Refresh 0033 Modification implements GSA's Class Deviation CD-2026-03, which eliminates the TAA exception previously applicable to AbilityOne NPAs.

132. The scale of these harms across the AbilityOne Program is significant. According to data provided to NAEPB, approximately 263 NSNs sold through GSA have been identified as not TAA-compliant. Those 263 NSNs generated approximately $13.8 million in sales in fiscal year 2025, and those sales are now at risk under the Class Deviation.

133. Applying the fiscal year 2025 AbilityOne Program ratio of sales per direct labor employee, the sales associated with those 263 GSA NSNs support approximately 52 or more direct labor positions held by people who are blind, creating imminent employment strains across qualified NPAs.

134. The Commission Directive, which was issued in direct response to the Class Deviation, further adds to these harms by requiring all NPAs, not only those that sell through GSA, to ensure that their Procurement List products "fully comply" with all applicable sourcing laws, including the TAA.

135. West Texas Lighthouse is a GSA MAS contract holder subject to the Refresh 0033 Modification and must accept it within 90 days of issuance.

136. West Texas Lighthouse has 107 NSNs on the Procurement List. Many of these products contain components from a variety of countries and are assembled at West Texas Lighthouse's facilities by employees who are blind or visually impaired. The products are sold on the GSA Schedule through distributors and wholesalers.

137. Approximately 57 percent of West Texas Lighthouse's products on the AbilityOne Procurement List and sold on the GSA Schedule are not currently TAA-compliant. Pulling all non-TAA compliant products from the GSA schedule amounts to approximately $1,231,746 worth of

lost revenue for West Texas Lighthouse, or approximately 54 percent of the organization's overall revenue from its federal sales.

138. Indeed, the Class Deviation immensely disrupts West Texas Lighthouse's entire supply chain. As a direct result of the Class Deviation, West Texas Lighthouse must entirely cease selling some of its products on the Procurement List.

139. And while West Texas Lighthouse is attempting to re-source certain components for some of its products, the cost for such re-sourcing is exorbitant. For those products that West Texas Lighthouse will re-source as a direct result of the Class Deviation, West Texas Lighthouse faces a 59 percent increase in its costs to sell these products, or approximately $199,749 per year. Other products, such as calculators, cannot be re-sourced from a TAA-compliant country, so West Texas Lighthouse will no longer be able to sell them to the federal government.

140. The combined loss in revenue from its discontinued products, along with the increase in costs due to re-sourcing, will jeopardize West Texas Lighthouse's ability to effectively carry out its mission of employing blind and/or severely disabled persons and undermining the Congressional intent expressed in the JWOD Act.

141. The manufacture and sale of the products affected by the Class Deviation represents approximately 29 percent of West Texas Lighthouse's blind direct labor requirements under the AbilityOne Program, or a total of approximately 13,991 Blind Work Hours ("BWH") that will no longer be needed. Translated into costs, this equates to a loss of $180,484 in base wages.

142. GVE has approximately 150 NSNs on the Procurement List, 69 of which are sponsored by GSA and listed on the GSA Schedule. GVE sells through two wholesalers, approximately 15 to 20 distributors, and other AbilityOne NPAs that operate Base Supply Centers. The majority of the products it sells to wholesalers and distributors are ultimately delivered to the

federal government. Many of GVE's products contain components from a variety of countries and are kitted and packaged at its Rochester facility by approximately 18 to 25 employees who are blind or visually impaired.

143. The Class Deviation is already disrupting GVE's sales channels. At least five of GVE's distributors have already asked GVE to certify the country of origin of its products.

144. Many of GVE's products, including label makers, printers, and computer monitors are sourced from non-TAA countries and brought to GVE's facilities for kitting, packaging, and distribution. These products are ultimately sold on the GSA Schedule to a wide range of federal agencies, so removing the TAA exception forecloses GVE from selling this entire product category to its wholesalers and distributors. These products generate more than $4 million in combined annual revenue for GVE, and six GVE employees work specifically on these products.

145. GVE knows of no domestically sourced or TAA-compliant alternative that would let it keep selling these products without operating at a financial deficit. As a result, GVE has decided that, to comply with the TAA, it will no longer be able to sell any of its label makers and printers and computer monitors on the Procurement List.

146. If GVE stops selling these products on the Procurement List, GVE will be forced to lay off six blind and visually impaired employees, who have an average tenure of ten years and are unlikely to find meaningful employment elsewhere. Those layoffs will in turn threaten GVE's ability to maintain the 75 percent direct labor hour ratio required to participate in the AbilityOne Program. To preserve that ratio, GVE may also have to terminate employees who are not blind or visually impaired.

147. The lost revenue will also damage GVE's community mission. GVE will need to look to its sister agency's retail operations for surplus revenue to support community services,

including 211 call center services, the Goodwill Learning Academy, and services for blind and visually impaired clients. That shift will necessarily lead to the reduction or elimination of vital services for blind and visually impaired individuals in the Rochester and Finger Lakes community.

148. Lighthouse Louisiana is the largest employer of individuals who are blind in Louisiana. It employs 106 people at three locations in New Orleans and Baton Rouge. Approximately 87 percent of its overall sales revenue comes from sales to the federal government, through contracts with GSA, the Defense Logistics Agency ("DLA"), federal distributors, and military base stores. Lighthouse Louisiana has 43 products on the Procurement List, all available for sale through a GSA contracting vehicle. In 2025, its federal sales totaled $17,041,802 and supported the employment of approximately 50 individuals who are blind or visually impaired.

149. To meet the TAA requirements imposed by the Class Deviation, Lighthouse Louisiana has reshored the sourcing of its raw materials and goods at significant cost of approximately $814,035 in lost revenue. Those figures do not include the indirect labor hours spent planning and executing the reshoring effort.

150. Lighthouse Louisiana cannot absorb these losses. Lighthouse Louisiana has reduced work hours across the board, lowering wages for all of its employees. The reductions are damaging Lighthouse Louisiana's reputation in its community, where it is known for stable jobs with competitive pay and benefits, and have hurt morale within the organization.

151. Even if price adjustments resulting from the Class Deviation are approved, government customers are likely to bypass the JWOD Act's mandatory purchase requirements and buy cheaper, non-compliant commercial alternatives instead, further eroding Lighthouse Louisiana's sales.

152. Any further disruption to Lighthouse Louisiana's financial viability places the organization at tremendous risk and threatens the vital community services funded by its production revenue.

153. These harms have been repeated and compounded across NAEPB's member agencies, many of which are subject to the same requirements under the Class Deviation and similarly will face severe economic losses, threats to the jobs of blind and visually impaired employees, and harms extending to their own community services.

## COUNT I

### The Class Deviation is in Excess of Statutory Authority and Contrary to Law (5 U.S.C. § 706(2)(A) and (C))

154. Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs.

155. The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

156. Agency action that is "not in accordance with law" must also be set aside. 5 U.S.C. § 706(2)(A).

157. The Class Deviation is contrary to law and exceeds GSA's statutory authority because it conflicts with the JWOD Act's mandatory-source requirement.

158. The JWOD Act provides an unqualified statutory command that federal agencies "shall" procure Procurement List products from AbilityOne NPAs. 41 U.S.C. § 8504(a). FAR 8.704(b) confirms that "[n]o other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List."

159. GSA cannot use its class deviation authority to override a statutory mandate. *See* FAR 1.402 (deviations authorized only "unless precluded by law"). The JWOD Act thus precludes a class deviation that conditions mandatory-source purchases on TAA compliance.

160. By subjecting AbilityOne acquisitions to the TAA, the Class Deviation renders many Procurement List products effectively unprocurable by GSA. Only the Commission has the statutory authority to add or remove items from the Procurement List, and such changes must be accomplished "by rule" pursuant to APA notice-and-comment procedures. 41 U.S.C. § 8503(a)(2); 41 C.F.R. § 51-2.3.

161. GSA cannot accomplish indirectly through a class deviation what requires formal rulemaking by a different agency. The Commission is the agency with the authority to administer the JWOD Act, not the GSA. And while the Commission may establish rules and regulations to implement the JWOD Act under FAR 8.702(c), notably, even the Commission is without authority to override the mandatory procurement requirement. *See, e.g.*, 41 U.S.C. § 8503(d) (noting the Committee "may prescribe regulations regarding specifications for products and services on the procurement list, the time of their delivery, and other matters *as necessary to carry out this chapter*." (emphasis added)).

162. FAR 25.401(a)(4) is a government-wide FAR provision adopted through the FAR Council's joint rulemaking process under 41 U.S.C. § 1303. Like the existing language at FAR 25.401(a)(4), the FAR Council's model deviation text for RFO Part 25 maintained the provisions that exempt AbilityOne contractors from meeting TAA requirements.

163. Under both FAR 1.402 and RFO 1.302, agencies may only issue class deviations where such deviations are not precluded by law, executive order, or regulation. Moreover, FAR

1.404 provides that when an agency requires a permanent class deviation, it should propose a FAR revision.

164. The Class Deviation is precluded by the JWOD Act's mandatory-source requirement, which operates independently from the TAA. Accordingly, the Class Deviation is "precluded by law," and GSA has exceeded its class deviation authority under FAR 1.402.

165. The TAA's legislative history confirms that goods made by individuals that are blind or disabled were intended to be outside the TAA's coverage. *See* S. Rep. No. 96-249, at 130. Congress has repeatedly carved AbilityOne out of competing procurement authorities, reflecting a consistent legislative intent to protect the JWOD Act's mandatory-source framework from displacement by other procurement regimes.

166. For these reasons, the Class Deviation must therefore be held unlawful and set aside as in excess of statutory authority and contrary to law. 5 U.S.C. § 706(2)(A), (C).

## **COUNT II**

### **The Class Deviation is Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))**

167. Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs.

168. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

169. Agency action is arbitrary and capricious where it is not reasonable and reasonably explained, including by failing to consider an important aspect of the problem or relevant reliance interests.

170. In issuing the Class Deviation, GSA failed to address or even acknowledge that FAR 8.704(b) provides that "[n]o other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List." By subjecting AbilityOne acquisitions to TAA restrictions, GSA created an impermissible conflict with the JWOD Act's mandatory-source requirement without explaining how this conflict would be resolved.

171. By eliminating the FAR 25.401(a)(4) exception through the Class Deviation, GSA failed to consider less disruptive alternatives, such as phased or voluntary compliance structures.

172. Further, GSA has not explained its selective removal of the AbilityOne and FPI exception in the Class Deviation, while leaving the other categories of FAR 25.401(a) exceptions intact.

173. Notably, the selective removal of the AbilityOne and FPI exception does not advance GSA's stated objectives. Because the TAA exception remains in place for other acquisitions, such as small business set-asides, the Class Deviation neither ensures removal of the targeted items from GSA contracts, nor reduces the risk of Chinese-made products entering the Government's supply chain, nor ensures consistent application of the TAA on GSA acquisitions. Moreover, GSA's stated concern with products "originating" in China is a country-of-origin concern that is not aligned with TAA compliance, which turns on "substantial transformation" and "designated country end product" determinations.

174. When an agency reverses a longstanding policy, it must at least display awareness that it is changing position and show that there are good reasons for the new policy.

175. GSA did not consider—let alone address—any reliance interests. For over four decades, the NPA Plaintiffs and other AbilityOne NPAs have structured their operations, supply chains, and employment programs in reliance on the FAR 25.401(a)(4) exception. In issuing the

Class Deviation, GSA failed to even acknowledge that it was changing a longstanding policy or offer any reasons for why a change of the four-decade-old policy was justified.

176. Specifically, GSA did not address the substantial reliance interests of the NPA Plaintiffs and other AbilityOne NPAs that have structured production, sourcing, pricing, and employment around the FAR 25.401(a)(4) exception.

177. The record surrounding the Class Deviation confirms that GSA did not engage in reasoned decision-making. GSA eliminated the TAA exception on the same day it issued a letter to the AbilityOne Commission requesting data needed to assess whether any problem existed; relied on inaccurate assertions about mislabeled products, the ETS policy, and pricing; offered an unsubstantiated China-focused rationale that the Class Deviation's scope does not match; and, as Mr. Koses's statements at the August 21 meeting reflect, did not consider implementation or the Class Deviation's effects on AbilityOne NPAs before acting.

178. For these reasons, the Class Deviation must therefore be held unlawful and set aside as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

## **COUNT III**

### **The Class Deviation is Issued Without Observance of Procedure Required by Law (5 U.S.C. § 706(2)(D); 41 U.S.C. § 1707)**

179. Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs.

180. The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

181. 41 U.S.C. § 1707 contains notice and comment procedures applicable to "executive agencies" as defined by 41 U.S.C. § 133.

182. GSA is an executive agency under 41 U.S.C. § 133.

183. 41 U.S.C. § 1707 provides that a "procurement policy, regulation, procedure, or form" (including a class deviation) may not take effect until 60 days after publication for public comment in the Federal Register if the policy (A) "relates to the expenditure of appropriated funds" and (B) has a "significant effect beyond the internal operating procedures" of the issuing agency or has a "significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)(1)(A)-(B).

184. Courts have found that a class deviation may fall within the ambit of procurement changes identified in the OFPP Act that require publication in the Federal Register. *See Navajo Refining Co., L.P. v. U.S.*, 58 Fed. Cl. 200, 209 (2003); *see also La Gloria Oil and Gas Co. v. U.S.*, 56 Fed. Cl. 211, 221-22 (2003), *abrogated on other grounds by Tesoro Hawaii Corp. v. U.S.*, 405 F.3d 1339 (Fed. Cir. 2005) ("Because defendant obtained the class deviation in contravention of the publication requirements established by . . . the OFPP Act, the class deviation was not authorized and is not valid[.]").

185. A policy, regulation, procedure, or form may take effect earlier than 60 days after publication if the agency shows "compelling circumstances" exist, but the effective date still may not be less than 30 days after the publication date. 41 U.S.C. § 1707(a)(2).

186. If "urgent and compelling" circumstances make compliance with the notice and comment requirements outlined in 41 U.S.C. § 1707(a) and (b) "impracticable," the "officer authorized to issue a procurement policy, regulation, procedure, or form" may, under 41 U.S.C. § 1707(d), waive those requirements and make the procurement policy, regulation, procedure, or form effective on a temporary basis only if (A) a notice of the policy, regulation, procedure, or form is published in the Federal Register and includes a statement that the policy, regulation,

procedure, or form is temporary; and (B) provision is made for a public comment period of 30 days beginning on the date on which the notice is published." 41 U.S.C. § 1707(d)-(e)(A)-(B).

187. Here, GSA failed to abide by the requirements set forth at 41 U.S.C. § 1707 when it issued the Class Deviation without engaging in any notice-and-comment process.

188. The Class Deviation is a "procurement policy, regulation, procedure, or form" within the meaning of 41 U.S.C. § 1707(a). It modifies the Federal Acquisition Regulation by striking FAR § 25.401(a)(4) for all GSA acquisitions.

189. The Class Deviation "relates to the expenditure of appropriated funds" and has a "significant effect beyond the internal operating procedures" of GSA because it applies to all GSA acquisitions and alters the obligations of AbilityOne NPAs, which are third-party contractors and suppliers, by subjecting them to TAA requirements from which they have been exempt for over 40 years. 41 U.S.C. § 1707(a)(1)(A)–(B)(i).

190. The Class Deviation also has a "significant cost or administrative impact on contractors or offerors" because it requires AbilityOne NPAs to restructure their supply chains and face the loss of employment opportunities for blind and severely disabled workers. 41 U.S.C. § 1707(a)(1)(B)(ii).

191. Section 1707 therefore required GSA to publish the Class Deviation in the Federal Register for a notice and comment period, under 41 U.S.C. § 1707(a)(1).

192. GSA issued the Class Deviation without attempting to comply with any of the statutory requirements listed in 41 U.S.C. §1707.

193. GSA did not publish notice of the Class Deviation in the Federal Register, nor did it provide an opportunity for any public comment on the Class Deviation whatsoever.

194. GSA did not invoke the urgent-and-compelling waiver under 41 U.S.C. § 1707(d), nor did it designate the Class Deviation as temporary.

195. Section 1707's requirements are mandatory. *See* 41 U.S.C. § 1707(b) (stating the "head of the agency *shall have published* in the Federal Register a notice . . . and provide for a public comment period for receiving and considering the views of all interested parties on the proposal" (emphasis added)).

196. The Class Deviation was therefore issued "without observance of procedure required by law" and must be held unlawful and set aside. 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

**A.** Declare that Class Deviation CD-2026-03, issued by GSA on August 14, 2026, is unlawful, null, and void;

**B.** Vacate Class Deviation CD-2026-03 in its entirety pursuant to 5 U.S.C. § 706(2);

**C.** Permanently enjoin Defendants from implementing or enforcing Class Deviation CD-2026-03 and the revocation of the AbilityOne TAA exception;

**D.** Declare that GSA's issuance of Class Deviation CD-2026-03 without publication in the Federal Register and without a public comment period violated 41 U.S.C. § 1707;

**E.** Declare that Class Deviation CD-2026-03 is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of 5 U.S.C. § 706(2)(A);

**F.** Declare that Class Deviation CD-2026-03 is in excess of GSA's statutory jurisdiction, authority, or limitations in violation of 5 U.S.C. § 706(2)(C);

**G.** Award Plaintiffs their costs and reasonable attorneys' fees to the extent permitted by law; and

**H.** Grant such other and further relief as this Court deems just and proper.

Dated: November 17, 2026

Respectfully submitted,

/s/ Jessica C. Abrahams
Jessica C. Abrahams (D.C. Bar No. 435361)
Andrew Van Houter* (N.J. Bar No. 90600-2012)
Dana B. Pashkoff** (D.C. Bar No. 459440)
Asher F. Young** (D.C. Bar No. 90043515)

**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street NW, Ste. 1100
Washington, DC 20005
Telephone: 202-230-5361
Jessica.Abrahams@faegredrinker.com
Andrew.VanHouter@faegredrinker.com
Dana.Pashkoff@faegredrinker.com
Asher.Young@faegredrinker.com

*Counsel for Plaintiffs the National Association for the Employment of People Who Are Blind; West Texas Lighthouse for the Blind; Goodwill Vision Enterprises; Lighthouse Louisiana*

* Motion for admission pro hac vice forthcoming.
**Application for admission to D.D.C. pending